## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **Todd West**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | Judge |
| **Jushi Holdings, Inc**.; | ) | |
| **JMGT, LLC; James Cacioppo**, an individual; | ) | Trial By Jury Demanded |
| and **Toya Bellamy-Lockhart**, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Todd West, by and through his attorneys, The Prinz Law Firm, P.C., hereby brings this Complaint, against Jushi Holdings, Inc., JMGT, LLC, James Cacioppo, and Toya Bellamy-Lockhart, and alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff Todd West ("Mr. West" or "Plaintiff") brings this action against his former employer, Jushi Holdings, Inc. and its subsidiary, JMGT, LLC (collectively, "Jushi," "Jushi Defendants," or the "Company"), stating claims under the Florida Private Whistleblower Act, F.S. § 448.102 ("FWA"), and the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq*. ("IWA"), in the alternative to Plaintiff's claim under the FWA. Plaintiff further brings this action against the Jushi Defendants under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*. ("IWPCA"), and for breach of contract, in the alternative to Plaintiff's claim under the IWPCA. Mr. West further asserts a claim against the Jushi Defendants for retaliatory discharge under Illinois common law. Mr. West further asserts claims against James Cacioppo ("Mr. Cacioppo") and Toya Bellamy-Lockhart ("Ms. Bellamy-Lockhart") in their individual capacities, stating

claims for violations of the IWPCA. Mr. West further asserts a claim against all Defendants under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA").

2.      Jushi, according to its website, is a "multi-state cannabis operator engaged in retail, cultivation, manufacturing, and processing operations in both medical and adult-use markets."[1] Jushi hired Mr. West on April 12, 2024 as its Chief Operating Officer ("COO") to manage the Company's operations, including grower-processor facilities and retail dispensaries, due to Mr. West's breadth of cannabis operations experience. Mr. West's experiences includes his successful tenure of more than five years as Executive Vice President of Operations at Cresco Labs, a cannabis operation much larger than that of Jushi.

3.      Jushi recruited Mr. West at a time when the Company was experiencing major regulatory and safety issues.  From the outset, Mr. West was ready for the challenge and took action to ensure the Company addressed its most pressing regulatory and safety issues, despite constant turnover in the Company's leadership.

4.      For instance, shortly before hiring Mr. West, on April 1, 2024, Jushi fired its heads of manufacturing and cultivation. In May of 2024, Jushi fired its Senior Vice President (David Powers) and its Director of Environmental Health and Safety (Scott Myles). In July of 2024, Jushi fired its Executive Vice President of Operations (Ryan Cook). In August of 2024, Jushi fired its Vice President of Quality (Eliel Melendez Muriente). In December of 2024, Jushi demoted its Vice President of Wholesale (Jimmy Wagner).

5.      The culmination of the turnover of these vital positions, many left unfilled throughout Mr. West's employment, left Mr. West with an extraordinary number of responsibilities that he never signed up for when he agreed to serve as Jushi's COO. Mr. West was

---

[1] *See* https://ir.jushico.com/company-information (Last accessed April 28, 2025).

required to take over Jushi's Wholesale, Commercial, and Sales and Operations Planning functions on top of his COO duties. Nonetheless, Mr. West continued to perform his job as it was asked of him with diligence, including ensuring that Jushi complied with safety regulations.

6.      Unfortunately, Jushi prioritized profitability over safety and regulatory compliance and sought to cut corners.  For example, it intentionally tried to avoid investing in equipment that would ensure the safety of its employees and other visitors to its facilities.

7.      Mr. West took the necessary step of hiring expert industry consultants to review Jushi's facilities' lab operations, standard operating procedures, equipment and design, productivity, efficiencies, quality, and safety and regulatory compliance. When these consultants made safety recommendations and concluded that certain Jushi facilities were out of regulatory compliance, they recommended shutting down operations. Understanding the gravity of ensuring Jushi's operations were safe and compliant with federal regulations, Mr. West followed the consultants' recommendations and communicated the same to Jushi's management.

8.      Instead of thanking Mr. West for his diligence in ensuring Jushi maintain regulatory compliance and safety standards, Jushi management, particularly James Cacioppo, Jushi's CEO, and Toya Bellamy-Lockhart, Jushi's Senior Vice President of Human Resources, teamed up to retaliate against Mr. West for raising these concerns. Specifically, Defendants manufactured a for-cause termination to remove Mr. West and deny him the bonus, severance, and vested stock options to which he was entitled–options he could have exercise within one year of a termination without cause.

## THE PARTIES

9.      Defendant Jushi Holdings Inc., a company incorporated in British Columbia, Canada, at all times herein was and is a cannabis company which operates retail locations across

the United States, including in the state of Illinois, and engages in the cultivation, processing, and manufacturing of cannabis products.  Jushi maintains its principal place of business at 301 Yamato Road, Suite 3250, Boca Raton, FL 33431.

10.     Defendant JMGT, LLC, a Florida limited liability company, at all times herein was and is a subsidiary of Jushi Holdings, Inc. JMGT, LLC maintains its principal place of business at 301 Yamato Road, Suite 3250, Boca Raton, FL 33431.

11.     Defendant James Cacioppo, at all times herein, was and is the CEO of the Jushi Defendants.

12.     Defendant Toya Bellamy-Lockhart, at all times herein, was and is the Senior Vice President of Human Resources of the Jushi Defendants.

13.     Plaintiff Todd West was and is a resident of Chicago, Illinois at all times relevant to this Complaint.

## VENUE AND JURISDICTION

14.     This Court has jurisdiction over Plaintiff's claims pursuant to 29 U.S.C. § 2617(a)(2) (the FMLA) and 28 U.S.C. § 1331 (federal question jurisdiction).

15.     This Court has jurisdiction over this matter under 28 U.S.C. §1332 because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and because the parties are diverse.

16.     Venue is further proper in this Court because the Jushi Defendants' principal place of business is located in the District and because both individual Defendants reside in the District.

## FACTS RELEVANT TO ALL CLAIMS

17.     Mr. West joined Jushi in April of 2024 as the COO of Jushi Holdings Inc., during a time when the Company was experiencing major regulatory and safety issues. With his more

4

than 25 years of business development and operations experience, including substantial experience in the new and innovative cannabis industry, Mr. West was well prepared to lead Jushi's operations. Mr. West's position was fully remote out of the state of Illinois with travel time of up to 75% throughout Jushi's retail cannabis dispensaries and grower-processor facilities. He reported directly to Jushi's CEO, Mr. Cacioppo. From the start, Mr. West was instrumental in improving the safety and compliance of Jushi's operations.

18.     Mr. West took his role within Jushi seriously. While committed to expanding the reach and profitability of its numerous retail and production facilities, he also worked diligently to address regulatory compliance and safety issues.

### Safety Issues at Jushi Facilities

19.     Just before Mr. West started as COO in April of 2024, Jushi terminated the heads of manufacturing and cultivation operations. The professionals Jushi terminated were subject matter experts on cannabis facility maintenance and operations and were critical to ensuring the overall strategy, compliance, and safety aspects of Jushi's business. Jushi denied Mr. West's repeated requests to backfill these roles.

20.     Left without a choice, Mr. West took on the role of ensuring safety and compliance within Jushi's facilities himself. In September of 2024, Mr. West hired the consulting firm, Data Extraction Consulting, LLC ("Data Extraction") to review Jushi's lab operations and its standard operating procedures, equipment and design, productivity, efficiency, quality, and regulatory compliance and safety. Data Extraction's initial focus was Jushi's grow processing facilities in Pennsylvania and Virginia.

21.     On or about December 23, 2024, Data Extraction presented a formal review to Jushi's executive team, including Mr. Cacioppo, ("The Data Extraction Review"). The Data

Extraction Review included updates on current equipment that needed to be turned off due to safety and compliance, production capacity compared to future needs, enhancements made in the facilities, product development updates, updates on items that were out of scope, and next steps.

22.     Part of the Data Extraction Review was to recommend that equipment used on Jushi's growing facilities' CO2 extractors must be original equipment manufactured ("OEM") in order to meet federal safety and regulatory compliance standards.

23.     In April of 2024, Mr. West made a site visit to Jushi's Reno, Nevada location. During his visit, Mr. West inquired about the lab's operations and its extraction booth. Jushi's Reno Lab Director and Operations Director informed Mr. West that they were experiencing safety issues with the extraction booth being improperly ventilated. As a result, alarms indicating improper ventilation and high levels of hazardous gas were triggered, which automatically called the fire department to the location more than eight times due to the lab's high levels of gas in the environment.

24.     Once Mr. West returned from his April 2024 Reno trip, he scheduled a meeting for April 30, 2024 with David Powers (Jushi's Senior Vice President of Operations) Scott Myles (Jushi's Director of Environmental Health and Safety), and Ryan Schultz (Jushi's Director of Operations), to discuss Mr. West's serious concerns regarding the extraction lab and regulatory compliance. As a result, Mr. West hired another consultant, PSI, to assess the Reno, Nevada lab for safety and compliance.

25.     PSI informed Leo Clavel (Jushi's Head of Construction and Maintenance), that there were multiple safety standard violations within the Reno, Nevada lab and recommended a shutdown to address those issues. On July 21, 2024, Mr. West reviewed PSI's findings with Mr. Clavel, Brian St. Peter (TITLE), and Mr. Shultz. They adopted PSI's recommendation to shut

down the extraction booth and address the safety deficiencies identified by PSI starting in or around July of 2024.

26.     Upon information and belief, the Reno, Nevada lab remains shut down as of this filing.

27.     During PSI's assessment of the Reno, Nevada facility, Mr. West learned that PSI had also previously performed a similar assessment of Jushi's Pennsylvania facility on May 3, 2022. That assessment also resulted in a report highlighting multiple safety and compliance deficiencies. Between the deficiencies identified by Data Extraction after Mr. West engaged their services and the deficiencies PSI identified in 2022, Mr. West, along with Mr. Clavel, Mr. St. Peter, and Mr. Schultz, also agreed to shut down the Pennsylvania lab in or around July of 2024 so that they could bring the lab into compliance. The lab remained shut down for approximately four weeks before reopening.

28.     On November 7, 2024, Mr. West again visited the Pennsylvania facility. Ryan Melody (Director of Operations for the Pennsylvania facility), informed Mr. West that a pump gasket and seal had blown within the facility's hydrocarbon booth. This happened after the facility had faced multiple pump failures during October of 2024. This problem was precipitated by difficulties that Pennsylvania facility staff were having contacting Isolate Extraction Systems ("IES"), the company that could provide the OEM pump seal. Dave Yusinski (Head of Engineering for the Pennsylvania facility) had found a pump company that could fabricate a new seal for the pump, however, it would not have been a required OEM part. Mr. West investigated whether adding a non-OEM pump seal would meet compliance and safety standards. He determined that in addition to potential dangerous gas leaks, using such a pump seal could cause a component of

the equipment to dislodge behind 2,500 to 3,000 pounds per square inch of pressure, with the potential to cause serious injury to persons in the facility.

29.     Following this conversation with Mr. Yusinski, Mr. West contacted Data Extraction to request guidance on how to proceed. They informed Mr. West that Jushi would be out of regulatory compliance for safety standards if it used non-OEM parts absent an inspection that could cost up to $20,000. The Data Extraction consultant strongly recommended shutting down the equipment until OEM parts could be obtained and compliance could be ensured, as there was a risk of death if someone were in the same room with the pump while the seal failed. Specifically, a seal could fail under high pressure, causing a part to dislodge, which could maim or kill a person in the room with equipment.

30.     On November 7, 2024, Mr. West learned that IES had declared bankruptcy and shut down its operations. Without the immediate ability to implement measures to operate the Pennsylvania facility safely, Mr. West contacted Mr. Barack and communicated his safety concerns, recommending that Jushi temporarily shut down the Pennsylvania facility. Mr. Barack agreed with Mr. West's recommendation.

31.     On November 7, 2024, less than two hours after Mr. West made the recommendation to temporarily shut down the Pennsylvania facility for safety reasons, Mr. Cacioppo called Mr. West and berated him. Mr. Cacioppo screamed at Mr. West for several minutes, making statements such as, "I am not in this business to *not* make money."  Mr. Cacioppo undermined Mr. West's decision to put safety first.

32.     During their November 7, 2024 call, Mr. West reminded Mr. Cacioppo that if a safety incident occurred at the Pennsylvania facility, it would be shut down and Jushi's licensing would be at risk. Most importantly, Mr. West reminded Mr. Cacioppo that a safety incident could

cost human life. Mr. West reiterated to Mr. Cacioppo that he does not compromise or cut corners when it comes to safety. Thereafter, Mr. Cacioppo became intent on pushing Mr. West out of the business.

33.     Following his November 7, 2024 phone call with Mr. Cacioppo, Mr. West immediately called Mr. Barack and asked whether Mr. Barack had any feedback for him and whether he was a good fit for Jushi, given the conversation with Mr. Cacioppo. Mr. Barack responded, stating that Mr. West was the right fit for Jushi and that he couldn't imagine not having Mr. West there. Mr. Barack claimed that Mr. Cacioppo was "just blowing off steam," and urged Mr. West not to "take it personally."

34.     On November 14, 2024, Dominick Griego (Jushi's Senior Vice President of Operations),  informed Mr. West that a quick connect part for the tubing that is attached to the IES $CO_2$ equipment located in the lab of Jushi's Ohio facility failed for a second time within a thirty-day timespan. Staff with the Ohio facility lab called their safety and compliance consultants in an attempt to obtain compliant parts. The Ohio facility lab was then temporarily closed for safety and compliance reasons. On November 20, 2024, the Ohio facility lab obtained and installed compliant parts, and the Ohio facility lab was operational by November 27, 2024.

35.     On November 20, 2024, Mr. West learned that Jushi's Virginia facility's IES $CO_2$ lab equipment was inoperable due to faulty custom-fit tubing. Mr. Griego informed Mr. West that he had consulted with a company called Swagelock given that IES support was unavailable. Swagelock recommend that a third party fabricate the required tubing to ensure compliance. Mr. Griego told Mr. West that he would be comfortable having the staff at the Virginia facility fabricate and bend the tubing themselves. Mr. West instructed Mr. Griego not to do so, as he was concerned that it would be unsafe for staff to fabricate a part that is used to transfer gas. The Virginia facility

was temporarily closed due to these safety and compliance concerns raised by Mr. West. However, by November 27, 2024, the Virginia facility was able to obtain compliant parts and the required inspections, allowing it to reopen.

36.     On November 21, 2024, Mr. West interacted with Mr. Cacioppo for the last time. During this call, Mr. West communicated his expectation that he would have stronger connectivity, transparency, and a better working relationship with Mr. Cacioppo as part of their CEO-COO relationship. Mr. West emphasized that if Mr. Cacioppo needed anything from him, he should not hesitate to reach out directly. Mr. Cacioppo did not acknowledge or address Mr. West's thoughtful feedback.  Instead, Mr. Cacioppo dismissed Mr. West's concerns and stated that he preferred to work with human resources.

37.     Mr. West understood that the Occupational Safety and Health Act ("OSH Act") obligates an employer to furnish a workplace "free from recognized hazards that are … likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). All of Mr. West's actions described in paragraphs 19 through 36 were undertaken to ensure Defendants' compliance with the OSH Act and to refuse participation in any violations of the Act, including its implementing regulations at 29 C.F.R. § 1910.106[2] and 29 C.F.R. § 1910.169[3].

## Defendants Retaliated Against Mr. West in Response to Him Raising Safety Concerns

38.     On November 20, 2024, less than two weeks after Mr. Cacioppo berated Mr. West for raising safety concerns, Jushi's Chief Financial Officer ("CFO"), Michelle Mosier, emailed Ms. Bellamy-Lockhart, raising several contrived concerns about Mr. West's performance. *See* Ex. 1, November 20, 2024 Email. Among the concerns Ms. Mosier raised was the following:

---

[2] This OSHA regulation covers the handling, storage, and use of flammable and combustible liquids.
[3] This OSHA regulation covers standards for pressurized air systems.

We are having trouble with our CO2 machines where they are not functioning due to parts breaking down. IES, the supplier went silent on us and rumors were that they were going out of business. [Mr. Cacioppo] and Jon asked that we address this immediately and get a redundant machine in place. A couple of weeks went by with little action. It was [Mr. Cacioppo's] insistence that resulted in us ordering a new CO2 machine from another company. [Mr. West] has a longer term view that we should move away from CO2 and did not support/understand the urgency. The issue being that transitioning from CO2 will take time (months). Without the CO2 machine operating our immediate results would be impacted - several people, including myself, have had discussion with him to explain that it's worth spending the $150K today to secure sales for the next couple of quarters.

39.    This communication completely misrepresented Mr. West's position and demonstrated that Defendants' primary goal was to continue using the dangerous equipment Jushi had in place at the Pennsylvania Facility, rather than addressing the safety concerns at issue. Aside from this section of the letter, which highlighted Defendants' concerns with profit over safety, Ms. Mosier's email contained multiple inaccuracies regarding Mr. West's work performance. Mr. West had no opportunity to respond to these inaccuracies because he was not included on the November 20, 2024 communication.

40.    On December 20, 2024, Mr. Cacioppo emailed Mr. West a 21-Day Notice Letter ("the December 20, 2024 Letter"), which appeared to be largely derived from the baseless complaints raised about Mr. West's performance in Ms. Mosier's November 20, 2024 email to Ms. Bellamy-Lockhart. *See* Ex. 2, December 20, 2024 Letter. Mr. Cacioppo copied Ms. Bellamy-Lockhart on this communication. The December 20, 2024 Letter, in part, stated:

On the GP side of operations, you have been inattentive to operational needs and have failed to competently problem solve to address issues. On multiple occasions, others within your organization stepped up to implement solutions to resolve operational issues with little direction from you. For example, when faced with critical equipment failures in Pennsylvania, Virginia and Ohio, you failed to conduct a thorough assessment or collaborate with internal and external experts on an appropriate solution. Instead, you relied on the flawed recommendations of your former Cresco colleagues that you hired as consultants. These consultants did not

have the appropriate level of expertise, and their recommendations were impractical
(if not flat-out wrong), resulting in a loss of revenue to the Company.

*Id.*

41.     The December 20, 2024, Letter stated that: "Failure to substantially improve your
performance in the next 21 days will result in the termination of your employment *for Cause.*"
(emphasis added). *Id.* It then provided several deliverables for "improvement" related to the
several baseless and false claims concerning Mr. West's performance. *Id.*

42.     Under Mr. West's Employment Agreement, Jushi was obligated to pay Mr. West a
Severance Payment in the amount of twelve (12) months of his Base Salary ($400,000) over a 12-
month period in installments based on Jushi's regular payroll schedule. *See* Ex. 3, Employment
Agreement. Mr. West's Employment Agreement also provided for a bonus in the amount of half
of Mr. West's base salary ($200,000) payable a year after his start date. *Id.* Mr. West's
Employment Agreement also included 250,000 shares in stock options which vested immediately
upon commencement of Mr. West's employment with Jushi and which could be exercised within
one year following a termination of employment with Jushi under the condition that the
termination was without cause. *Id.*

43.     Defendants issued the December 20, 2024 Letter less than one week before the
Christmas holiday–during a period when many businesses and professionals shut down for nearly
two weeks–thereby giving Mr. West no opportunity to address the deliverables, even if had they
not been false and baseless. The fact that Jushi provided Mr. West with a 21-day deadline to
complete significant deliverables during this time of year underscores the fact that Jushi
manufactured cause to avoid complying with the severance and bonus provisions of Mr. West's
Employment Agreement.

44.     The December 20, 2024 Letter was filled entirely with false statements about Mr. West's performance, underscoring that it was merely a pretext for terminating him in retaliation for his safety reporting and efforts to protect employees. *See* Ex. 2.

45.     In response to Jushi's December 20, 2024 Letter, Mr. West wrote a letter dated January 3, 2025, contesting the basis for the "for cause" language therein. *See* Ex. 4, Correspondence Dated January 3, 2025. In his January 3, 2025 communication, Mr. West addressed each of the supposed deliverables for improvement, communicating each reason why they were false and baseless. *Id.* Most importantly, Mr. West explained that he had engaged consultants "to conduct discovery on our lab operations to review SOP's, current equipment and design, how to optimize extracting capabilities, productivity, efficiencies, quality, new products and safety" and reminded Jushi that "the NV lab is shut down due to safety and for being non-compliant." *Id.* Mr. West further put Jushi on notice that he viewed Jushi's December 20, 2024 Letter as "an effort to terminate [his] employment and avoid paying the severance and benefits promised in [his] Employment Agreement." *Id.* Mr. West concluded his letter by stating, "Please let me know by end of day on January 6 how you would like to address this matter." *Id.*

46.     Jushi's conduct over the course of his employment, and particularly in issuing the December 20, 2024 Letter, caused Mr. West severe anxiety and distress, causing him health issues.

47.     On January 4, 2025, Mr. West notified Jushi via email that he had a doctor's appointment scheduled for January 6, 2025. *See* Ex. 5, Email dated January 4, 2025. Mr. West then communicated to Jushi on January 6, 2025, that his "doctor has recommended that [he] take a short leave of absence and has requested FMLA and disability leave paperwork." *See* Ex. 6, West Email Dated January 6, 2025.

48.     However, on January 6, 2025, rather than addressing Mr. West's detailed concerns raised in his January 3, 2025 letter, or providing guidance or paperwork as to FMLA or ADA accommodations, Jushi issued a termination letter to him the same day. *See* Ex. 7, Termination Letter Dated January 6, 2025.

### COUNT I
### RETALIATORY DISCHARGE
### FLORIDA PRIVATE WHISTLEBLOWER ACT
### Florida Statutes § 448.102
### (Against the Jushi Defendants)

49.     Plaintiff reincorporates and re-alleges the allegations in the preceding paragraphs.

50.     At all times relevant to this Complaint, the FWA was in effect.

51.     At all times relevant to this Complaint, Plaintiff was an "employee" of the Jushi Defendants, as defined in F.S. § 448.101(3).

52.     At all times relevant to this Complaint, the Jushi Defendants were "employers," as defined in F.S. § 448.101(2).

53.     Mr. West understood that the Occupational Safety and Health Act ("OSH Act") obligates an employer to furnish a workplace "free from recognized hazards that are … likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). All of Mr. West's actions described in paragraphs 19 through 36 were undertaken to ensure Defendants' compliance with the OSH Act and to refuse participation in any violations of the Act and its implementing regulations.

54.     On numerous occasions, Mr. West reported and refused to participate in an activity that he had a good faith belief would result in a violation of a state or federal law, rule, or regulation, including the OSH Act and its implementing regulations.

55.     After it became clear to Mr. West that Jushi's facilities failed to meet safety standards, Mr. West saw that the facilities were temporarily closed until those standards were

reached, and communicated the same to the Jushi Defendants. Mr. West had a good faith belief that failure to ensure safety by taking such measures would violate a state or federal law, rule, or regulation.

56.     Defendant retaliated against Mr. West by terminating his employment.

WHEREFORE, Plaintiff, Mr. West, prays that this Court enter judgement in his favor and against the Jushi Defendants as follows:

A.   That a finding be entered that the Jushi Defendants violated the FWA by retaliating against Plaintiff for reporting and refusing to engage in conduct that he believed in good faith would violate state or federal law, rule, or regulation;

B.   That Mr. West be awarded back pay, with interest;

C.   That Mr. West be awarded reinstatement, or in the alternative, front pay;

D.   That Mr. West be awarded compensation for any damages sustained as a result of the violation, including litigation costs, any expert witness fees, and reasonable attorneys' fees; and

E.   That Mr. West be awarded any other or further relief as this Court deems necessary to effectuate the purpose of the FWA, including all necessary relief to make Mr. West whole.

## COUNT II
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
## 740 ILCS 174/1 *et seq.*
**(Against the Jushi Defendants)**
**(In the Alternative to Plaintiff's FWA Claims)**

57.     Plaintiff reincorporates and re-alleges the allegations in the preceding paragraphs.

58.     At all times relevant to this Complaint, the Illinois Whistleblower Act ("IWA") was in effect. At the time of Mr. West's discharge, it provided, in pertinent part, that "[a]n employer

may not take retaliatory action against an employee for refusing to participate in an activity that the employee has a good faith belief that such participation would result in a violation of a State or federal law, rule, or regulation."  740 ILCS 174/20.

59.     At all times relevant to this Complaint, the Jushi Defendants were "employers" within the meaning of the IWA.

60.     At all times relevant to this Complaint, Mr. West was an "employee" within the meaning of the IWA.

61.     Mr. West understood that the Occupational Safety and Health Act ("OSH Act") obligates an employer to furnish a workplace "free from recognized hazards that are … likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). All of Mr. West's actions described in paragraphs 19 through 36 were undertaken ensure Defendants' compliance with the OSH Act and to refuse participation in any violations of the Act and its implementing regulations.

62.     On numerous occasions, Mr. West refused to participate in an activity that he had a good faith belief would result in a violation of a state or federal law, rule, or regulation, including the OSH Act and its implementing regulations.

63.     After it became clear to Mr. West that Jushi's facilities failed to meet safety standards, Mr. West ensured that the facilities were temporarily closed until those standards were reached, and communicated the same to the Jushi Defendants. Mr. West had a good faith belief that failure to ensure safety by taking such measures would violate a state or federal law, rule, or regulation.

64.     Defendant retaliated against Mr. West by terminating his employment.

WHEREFORE, Plaintiff, Mr. West, prays that this Court enter judgement in his favor and against the Jushi Defendants as follows:

A.  That a finding be entered that the Jushi Defendants violated the Illinois Whistleblower Act by retaliating against Plaintiff for refusing to engage in conduct that he believed in good faith would violate state or federal law, rule, or regulation;

B.  That Mr. West be awarded back pay, with interest;

C.  That Mr. West be awarded reinstatement, or in the alternative, front pay;

D.  That Mr. West be awarded compensation for any damages sustained as a result of the violation, including litigation costs, any expert witness fees, and reasonable attorneys' fees; and

E.  That Mr. West be awarded any other or further relief as this Court deems necessary to effectuate the purpose of the Illinois Whistleblower Act, including all necessary relief to make Mr. West whole.

**COUNT III**
**VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
**820 ILCS § 115/ *et seq.***
**(Against all Defendants)**

65.  Plaintiff reincorporates and re-alleges the allegations in the preceding paragraphs.

66.  Mr. West was at all times relevant, an "employee" under the IWPCA.

67.  The Jushi Defendants, Mr. Cacioppo, and Ms. Bellamy-Lockhart were at all times relevant, "employers" under the IWPCA.

68.  Section 2 of the IWPCA defines "final compensation," as including wages, salaries, earned commissions, earned bonuses, the monetary equivalent of earned vacation and earned holidays, and any other compensation owed by the employer pursuant to an employment contract or agreement between the two parties. See 820 ILCS § 115/2.  Section 5 of the IWPCA provides that employers must pay an employee's final compensation no later than the next scheduled payroll date after termination of his employment. See 820 ILCS § 115/5.

69.     Pursuant to the IWPCA, 820 ILCS § 115/1, *et seq.*, which Defendants have violated, Mr. West is entitled to be compensated for the final compensation owed to him. Specifically, Defendants failed to issue final compensation to Mr. West as required in his employment agreement by denying him severance payment in the amount of twelve (12) months of his base salary of $400,000, and his nondiscretionary bonus of $200,000.

70.     As a result of the Jushi Defendants' breach, Mr. West has been damaged in an amount in excess of $600,000, in direct violation of 820 ILCS § 115/4 & § 115/5.

71.     820 ILCS § 1155/13 provides:

"In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation."

72.     Mr. Cacioppo, as the CEO, Chairman, and Founder of the Jushi Defendants, knowingly permitted the Jushi Defendants not to pay Mr. West's earned compensation.

73.     Ms. Bellamy-Lockhart, as the Senior Vice President of Human Resources of the Jushi Defendants, knowingly permitted the Jushi Defendants not to pay Mr. West's earned compensation.

74.     The IWPCA mandates interest penalties for each month following the date of payment during which such underpayments remain unpaid should accrue at a rate of 5%. *See* 820 ILCS § 115/14.

WHEREFORE, Plaintiff, Mr. West, respectfully requests that this Court enter judgment in his favor and against all Defendants as follows:

A.   Find that Defendants violated the IWPCA by failing by failing to pay Plaintiff his severance equivalent to his base salary of $400,000 and his nondiscretionary bonus of $200,000;

B.  Award Plaintiff $600,000, as Plaintiff's Employment Agreement requires;

C.  Award Plaintiff pre-judgment interest at the rate of 5% per month for every month the

contractually guaranteed $600,000 remains outstanding;

D.  Award Plaintiff litigation costs and reasonable attorneys' fees; and

E.  Award Plaintiff any other or further relief as this Court deems necessary to effectuate

the purpose of the IWPCA.

### COUNT IV –BREACH OF CONTRACT
**(In the Alternative to Plaintiff's Claims Under the IWPCA)**
**(Against the Jushi Defendants)**

75.     Plaintiff reincorporates and re-alleges the allegations in the preceding paragraphs.

76.     In the parties' Employment Agreement, the Jushi Defendants agreed to pay Mr.

West a severance payment should Jushi terminate his employment without cause.

77.     The Jushi Defendants agreed to allow Mr. West to exercise his 250,000 vested stock

options within one year of separation should Jushi terminate his employment without cause.

78.     On January 6, 2025, Jushi terminated Mr. West from his employment with the Jushi

Defendants without cause.

79.     The Jushi Defendants have prevented Mr. West from exercising his 250,000 vested

stock options within one year of his termination, in violation of his Employment Agreement.

80.     The Jushi Defendants agreed to pay Mr. West a bonus payment one year following

his start date. The Jushi Defendants unjustly terminated Mr. West's employment earlier than one

year following his start date as a means to avoid paying him his bonus.

81.     By withholding these payments, the Jushi Defendants have violated the parties'

Employment Agreement.

82.     As a result of the Jushi Defendants' breach of the parties' Employment Agreement, Mr. West has suffered, and continues to suffer, damages, including but not limited to the loss of compensation and benefits.

WHEREFORE, Plaintiff, Mr. West, prays that this Court enter judgement in his favor and against the Jushi Defendants as follows:

A.   Compensatory damages, including ongoing losses consisting of future wages and benefits, prejudgment interest, and attorneys' fees pursuant to Fla. Stat. § 448.08; and,

B.   Any further relief that this Court deems just and proper.

## COUNT V – RETALIATORY DISCHARGE UNDER ILLINOIS COMMON LAW
### (Against the Jushi Defendants)

83.     Plaintiff reincorporates and re-alleges the allegations in the preceding paragraphs.

84.     The Jushi Defendants discharged Mr. West in retaliation for his making complaints regarding the Jushi Defendants' violations of public policy.

85.     Mr. West made reports to the Jushi Defendants that their facilities failed to meet safety standards and that the facilities in their current condition could result in serious injury or death to persons in the facilities.

86.     Clearly mandated public policy protected Mr. West's reports and complaints regarding the Jushi Defendants' conduct.

87.     In response to Mr. West's reports and complaints, the Jushi Defendants terminated his employment.

88.     The Jushi Defendants' actions in terminating Mr. West in retaliation for his protected activity were intentional, with malice, willful, wanton, and in disregard of Mr. West's right to be free from retaliation under Illinois law.

WHEREFORE, Plaintiff, Mr. West, prays that this Court enters judgement in his favor and against the Jushi Defendants as follows:

A. That a finding be entered that the Jushi Defendants retaliated against Mr. West in response to Mr. West making reports that he reasonably believed that the Jushi Defendants violated public policy;

B. That Mr. West be awarded back pay, with interest;

C. That Mr. West be awarded front pay;

D. That Mr. West be awarded punitive damages in an amount determined by the jury to punish Jushi Defendants for its violation of the Illinois common law;

E. That Mr. West be awarded compensation for any damages sustained as a result of the violation, including litigation costs, any expert witness fees, and reasonable attorneys' fees; and

F. That Mr. West be awarded any other or further relief as this Court deems just and proper under the circumstances.

**COUNT VI**
**FMLA**
**29 U.S.C. § 2601 *et seq*.**
**(Against all Defendants)**

89.     Plaintiff reincorporates and re-alleges the allegations in the preceding paragraphs.

90.     At all times relevant to this Complaint, Plaintiff was an "eligible employee" under the FMLA, 29 U.S.C. § 2611(2).

91.     At all times relevant to this Complaint, the Jushi Defendants are and were an "employer" within the meaning of the FMLA, 29 U.S.C. § 2611(4).

92.     The Individual Defendants directly participated in the decision to terminate Plaintiff's employment because he exercised his rights under the FMLA.

93.     Defendants were on notice of Plaintiff's entitlement to take FMLA leave and his request to do so. Defendants terminated Plaintiff's employment on January 6, 2025, the same day he requested FMLA leave, because of his request.

94.     Through their actions described above, Defendants retaliated against Plaintiff for requesting FMLA and for opposing any practice which is unlawful under the FMLA, in violation of 29 U.S.C. § 2615(a)(2).

95.     As a result of Defendants' conduct, Plaintiff has suffered damages, including but not limited to, lost wages and benefits.

WHEREFORE, Plaintiff, Mr. West, prays that this Court enter judgement in his favor and against Defendants as follows:

A.   Award Plaintiff the value of wages, liquidated damages, backpay, employment benefits, compensatory damages, other compensation lost as a result of Defendants' unlawful conduct, and other make-whole legal and equitable relief;

B.   Enjoin Defendants and all officers, agents, employees, and all persons in active concert or participation with them from further violations of the FMLA;

C.   Award Plaintiff his reasonable attorney's fees, costs, and expenses associated with this litigation;

D.   Award Plaintiff pre- and post-judgment interest; and

E.   Order all other appropriate relief as the interests of justice may require.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully demands a trial by jury of the allegations contained in this Complaint.

Respectfully submitted,

TERI GUTTMAN VALDES LLc


By:   */s/ Teri Gutman Valdes*
   Teri Guttman Valdes, Esq.
   1501 Venera Avenue, Suite 300
   Coral Gables, FL 33146
   P: 305-740-9600
   Email: tgvaldes@aol.om
   Florida Bar No. 10741

THE PRINZ LAW FIRM, P.C.
Kristen E. Prinz (kprinz@prinz-lawfirm.com)
Illinois Bar No. 6291900
Mary F. Charlton (mcharlton@prinz-lawfirm.com)
Illinois Bar No. 6330938
1 East Wacker Dr., Suite 1800
Chicago, IL 60601
P:  (312) 212-4450
F:  (312) 284-4822